In the Matter of the Application of THE CITY OF NEW YORK, for an Alternative Prohibition Order, Respondent, *v.* WILLIAM A. PRENDERGAST and Others, Constituting the PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK, Appellants.

First Department, July 14, 1922.

Public Service Commission — jurisdiction — Public Service Commission was established to regulate public service corporations — electrical subway corporation in New York city not public service corporation — local and special statutes relating to construction and regulation of subways in New York city carrying electrical wires not repealed by implication by Public Service Commissions Law (now Public Service Commission Law) — Public Service Commission has no jurisdiction to regulate rates of electrical subway corporation.

The Public Service Commission was established for the purpose of regulating corporations which rendered service to the public for which they were entitled to charge, that they might be required to render an adequate service for a reasonable compensation.

The electrical subway corporations in New York city, which are engaged in the construction and maintenance of subways for the purpose of carrying electrical

---

* See Code Civ. Proc. § 483; now Rules Civ. Prac. rule 90.— [REP.

conductors and wires, were not organized for the purpose of serving the public for which the public was required to pay, but their organization and the construction of the subways was brought about by the exercise of the power of the State as keeper of the highways to render them safe and convenient for the public use for which they were intended by requiring that all wires carrying electrical current should be placed underground.

The local and special statutes relating to the construction, maintenance and regulation of subways to carry electrical conductors and wires of the electric light companies in the city of New York under which, as they now stand, the power of regulation rests upon the city of New York and its officers, were not repealed by implication by the enactment of the Public Service Commissions Law (now Public Service Commission Law), for said local and special acts were not so inconsistent with the later statute as to lead to the conclusion that it was the intention of the Legislature to repeal them.

Accordingly, the Public Service Commission has no jurisdiction over the rates to be charged for the services performed by the corporations maintaining the electrical subways in New York city.

APPEAL by the defendants, William A. Prendergast and others, from a prohibition order granted by the Supreme Court at the New York Special Term and entered in the office of the clerk of the county of New York on the 22d day of March, 1922, prohibiting them, as members of the Public Service Commission of the State of New York, from conducting a proceeding for the purpose of fixing the rates to be charged by the Consolidated Telegraph and Electrical Subway Company.

*Ledyard P. Hale* of counsel [*Harry Myron Chamberlain* with him on the brief], for the appellants.

*John P. O'Brien, Corporation Counsel* [*William B. Carswell* of counsel], for the respondent.

PAGE, J.:

The question presented by this appeal is whether the local and special statutes relating to the construction, maintenance and regulation of subways to carry electrical conductors and wires of the electric light companies in the city of New York were repealed, or so much thereof as gave the right to revise the rentals to be charged, were repealed, and power vested in the Public Service Commission. A somewhat extended review of the statutes would seem to be necessary to a proper consideration of the subject.

Prior to 1884 the telegraph, telephone and electric light companies had franchise rights to carry their wires upon poles placed in the streets of the city of New York. This method of transmission of electric current was deemed dangerous to the safety of pedestrians and those engaged in the usual street traffic, and a plan was devised for the construction of underground subways in which these wires could be placed. Statutes were enacted

whereby a board of commissioners of electrical subways was created. (Laws of 1884, chap. 534; Laws of 1885, chap. 499; Laws of 1886, chap. 503.) The commissioners were instructed to require the various electrical corporations to submit, within sixty days, a plan or plans for carrying on their operations underground, and in the case of the failure of such companies to submit plans, the commissioners were required to devise plans and to construct subways. It was the intention of these acts that the various electrical corporations should provide the subways, and no provision was made for the commission to finance the construction, either by an appropriation therefor, or an authorization to borrow money. The companies failed to submit plans; in fact, most of the companies bitterly contested the legislation, as it entailed on them a great expense and conferred on them no added benefit. In this situation the Consolidated Telegraph and Electrical Subway Company offered to build the subways. A contract was entered into, dated July 22, 1886, between said company and the commissioners of electrical subways. A further contract modifying the original was made, dated April 7, 1887. These contracts were ratified by the Legislature. (Laws of 1887, chap. 716.) Pursuant to this contract the Consolidated Telegraph and Electrical Subway Company constructed subways to accommodate low tension electrical lines, such as were used by the telegraph and telephone companies and low tension wires of electric light companies, and also subways to accommodate high tension lines used in distributing light, heat and power. In 1891 the two systems were divided, and the low tension subways which had been constructed by the Consolidated Subway Company were conveyed to the Empire City Subway Company, and the power and duty to construct, maintain and operate such subways for low tension lines was granted to and assumed by the Empire City Subway Company. This new contract was authorized by the Legislature (Laws of 1891, chap. 231); since which time the high tension electric lines have been placed in the subways of the Consolidated Company.

The contract entered into between the commissioners of electrical subways and the Consolidated Company, which was ratified by the Legislature, so far as material to this inquiry, was as follows: The Consolidated Company was to provide, build, equip, maintain and operate the subways therein mentioned; the said company to fix a fair scale of rents to be charged according to the kind of conductors and the amount of space required therefor which was to be at the same rate to all occupants making a like use of said subways, but the scale of rentals or any charges fixed or made by the said company was to be at all times subject to the control, modifica-

tion and revision of the commissioners of electrical subways, or their successors; whenever the net annual profits of the Consolidated Company, remaining after the payment of the expenses of maintaining and operating such subways, should exceed ten per cent upon the actual cash capital invested by it in providing, constructing and equipping such subways, then the excess of such profits over the ten per cent was to be paid into the treasury of the city of New York; but if in any year or years prior to the earning of such excess the earnings of the Consolidated Company should not have equalled ten per cent, then the Consolidated Company should be first entitled to recoup itself out of such excess for the difference between the actual annual earnings and the said ten per cent, the intention being that no payment should be made to the city of New York out of such excess of earnings until the Consolidated Company should first have actually earned and received ten per cent for each year theretofore. In case any dispute should arise between the Consolidated Company and any company occupying or desiring to occupy said subways, the same was to be referred to the commissioners of electrical subways or their successors for settlement, whose decision should be final. It was further provided that the successors of the commissioners of electrical subways should be construed to include those who may succeed them as commissioners under the provisions of existing laws, or under the provisions of any law hereafter passed by the Legislature of the State of New York, or any officer or officers of the city of New York who shall succeed to the powers and duties of the commissioners of electrical subways, or any part of such powers and duties, under the provisions of any law now existing or hereafter enacted by said Legislature, or any other persons or officers hereafter appointed or selected pursuant to any law, to succeed to the powers and duties, or any part thereof, of the said commissioners. There is also contained in the contract a provision permitting the city of New York to purchase the subways.

After a large number of miles of the subways had been completed, the Consolidated Company fixed a scale of rentals, and the electric light companies hired space, but after a short time refused to pay the rent, and on being threatened with eviction from the subways, the Brush Electric Light Company brought an action claiming the rental charged by the Consolidated Company was unreasonable and unjust, and asked to have a fair scale of rentals determined by the court, and for an injunction. The court denied the motion for an injunction *pendente lite*, and on appeal the court, among other reasons for affirmance, said: " If any harsh or unfair contract was insisted upon, under the circumstances, by the defendant, the

plaintiffs had their appeal, because the scale of rents or any charge fixed or made by the defendant was at all times subject to the control, modification and revision of the Board of Electrical Control or their successors, and if the terms of the contract which had been entered into between the defendant and the electric light companies were of such a character as required modification, an appeal was given to the Board of Electrical Control, and with but one exception, as far as we can see from the papers, no such rights were ever exercised." (*Brush Electric Co.* v. *Subway Co.*, 60 Hun, 446, 452.) One of the companies did appeal to the board of electrical control (see *infra*), as noted above, and the said commissioners reduced the schedule of rentals, and such schedule has been in operation ever since, without complaint on the part of the Consolidated Company or its tenants.

By chapter 716 of the Laws of 1887 it was provided that from and after the passage of said act and until the 1st day of November, 1890, the board of commissioners of electrical subways, together with the mayor of the city of New York, were constituted the board of electrical control, and the act further provided: "All the powers and duties conferred or imposed by the said act chapter four hundred and ninety-nine of the laws of eighteen hundred and eighty-five, upon the commissioners appointed thereunder in and for the city of New York, and all the powers and duties heretofore by any law conferred or imposed upon the local authorities of said city, or any of them, in respect to or affecting the placing, erecting, construction, suspension, maintenance, use, regulation or control of electrical conductors or conduits or subways for electrical conductors in said city are hereby transferred to and conferred and imposed upon, and shall hereafter be exclusively exercised and performed by the said board of electrical control, constituted as provided in this act, and its successors as hereinafter provided."

The term of office of the board of electrical control was extended from time to time, and the rights, powers and duties vested or existing in said board of electrical control were continued during such extended period. (Laws of 1890, chap. 550; Laws of 1891, chap. 383; Laws of 1892, chap. 263; Laws of 1893, chap. 396; Laws of 1894, chap. 207; Laws of 1897, chap. 710.) By the Greater New York charter (Laws of 1897, chap. 378, §§ 581–588) the board of electrical control was abolished, and all the powers and duties thereof were conferred and imposed upon the city of New York and, as a matter of administration, were devolved upon the commissioner of public buildings, lighting and supplies. In the amended Greater New York charter (Laws of 1901, chap. 466, §§ 525–531) the powers were conferred upon the city of New York, to be exercised in some

instances by the board of estimate and apportionment, and as to matters of administration were devolved upon the commissioner of water supply, gas and electricity. (See, also, Laws of 1916, chap. 602, amdg. Greater New York Charter of 1901, § 469, subd. 5.)

On January 21, 1922, the mayor of the city of New York received a certified copy of an order of the Public Service Commission of the State of New York, entitled " Matter of rates of Consolidated Telegraph and Electrical Subway Company for use of conduits in the City of New York," ordering, on its own motion, that a hearing be had by said Commission, as to the rates, charges and classification of service of the Consolidated Telegraph and Electrical Subway Company for the use of conduits, ducts, etc., to the end that the Commission shall prescribe just and reasonable rates, charges and classifications to be there in force for the service to be furnished by such corporation, and the just and reasonable acts and regulations to be done and observed by such corporation relating thereto. The corporation counsel of the city of New York obtained an order prohibiting the said Commission from proceeding in the matter. From that order this appeal is taken.

The sole question to be determined is, whether the Public Service Commission has jurisdiction of the subject-matter.

The Public Service Commission was established for the purpose of regulating corporations who rendered service to the public for which they were entitled to charge, that they might be required to render adequate service for a reasonable compensation. This was the fundamental purpose of the law, and the various provisions of the law establishing the Commission had this object in view. As will appear from the consideration of the legislation with respect to the electrical subways in the city of New York, there was no purpose of serving the public for which the public was required to pay. Certain corporations were transmitting electric current by means of overhead wires on the city streets, by right of franchises. This created a dangerous condition, especially such as were used for the transmission of high power currents for electric light, heat and power. The removal of the poles from the street and placing the wires underground had no relation to the service of the companies to their patrons, nor to the rate of charge for such service. It was not an exercise of the regulatory power of the State over public service corporations. It was an exercise of the power and duty of the State as keeper of the highways to render them safe and convenient for the public use for which they were intended. When the acts above referred to were passed and the subways were completed, the companies had no right longer to maintain their poles and wires above the street. They were there without authority and

became a nuisance. (*American R. T. Co.* v. *Hess*, 125 N. Y. 641, 649.) Because of the right to be in the streets, some other means of exercising their franchise rights had to be afforded; a destruction of their means of transmission of electrical current would effectually deprive the companies of their power to transact the business for which they were incorporated and deprive the public of the benefit of their service. To provide facilities for the transaction of their business, and to abate the nuisance of the use of the public highways, the Consolidated Company under contract with the State (for the board of commissioners of electrical subways was a State body empowered to act on behalf of the State), constructed the subways at its own expense, and was authorized to charge a reasonable rental for the space in its subways, subject to the supervision of the commissioners, to whom was added the chief executive officer of the city. By subsequent legislation the supervisory power over this company was transferred to the city and one of the officers thereof. The last act of the Legislature (Laws of 1916, chap. 602, amdg. Greater New York Charter of 1901, § 469, subd. 5) conferring power on the commissioner of water supply, gas and electricity over these subways was passed subsequent to the enactment of the Public Service Commissions Law, the short title of which was changed by chapter 134 of the Laws of 1921 to the Public Service Commission Law.

The attorney for the Commission argues that because the definition in the Public Service Commission Law of the words " electrical corporation " includes a corporation owning, operating or managing any electric plant, and among the facilities which go to make up an " electric plant " as defined in the law, are included conduits and ducts for holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power, and the Commission is given the supervision of electrical corporations and can prescribe the rates that they can charge the public for their service,* therefore, the special statutes relating to the electrical subways in New York city are repealed, and the supervision of the operation, the regulation and control of the Consolidated Company is taken away from the city of New York and the officers thereof and vested in the Public Service Commission.

The appellants argue that the special local acts providing for the construction and regulation of the electrical subways were repealed by implication by the enactment of the Public Service Commission Law, a general statute dealing, as they claim, with the same subject.

---

* See Pub. Serv. Comm. Law, § 2, subds. 12, 13; Id. § 66, as amd. by Laws of 1913, chap. 504; Laws of 1920, chaps. 540, 542, and Laws of 1921, chap. 134.— [REP.

It is true, as said by the Court of Appeals, that while " ' a general statute will repeal special or local acts, without expressly naming them, where they are inconsistent with it, and where it can be seen from the whole enactment that it was the intention of the Legislature to sweep away all local peculiarities thus sanctioned by special acts, and to establish one uniform system ' (Black on Interpretation of Laws, section 153), ' there is no rule of law which prohibits the repeal of a special act by a general one, nor is there any principle forbidding such repeal without the use of words declarative of that intent.' " But the court, quoting from Sutherland on Statutory Construction (§ 159), further said: " The question is always one of intention, and the purpose of abrogating a particular enactment by a later general statute is sufficiently manifested when the provisions cannot stand together." (*People ex rel. Fleming* v. *Dalton,* 158 N. Y. 175, 184.) Applying this test, it will be found that there is no conflict or contradiction between the provisions of the earlier statutes and the Public Service Commission Law. The Commission can and does regulate the price to be charged, the operation and other details of service of the electric light companies that use this subway. The rent paid is an operating expense, which, if the subways did not exist, would have to be paid by the user for maintenance and upkeep of poles and insulators on its distributing system, upon which an allowance for depreciation would have to be made, and upon the capital invested in which the companies would have to be allowed a fair return in establishing the rates to be charged to their customers.

The powers conferred on the board of electrical control by the earlier statutes have now been devolved upon the city of New York and its officers and are embodied in the Greater New York charter. Whatever power existed in the board of electrical control to modify or revise the rentals charged by the Consolidated Company, is by the charter vested in city officials. In *People ex rel. New York, N. H. & H. R. R. Co.* v. *Willcox* (200 N. Y. 423, 429) the Public Service Commission attempted to exercise a power apparently within its jurisdiction, but which was by the Greater New York charter vested in the board of health. The court held that the power vested in the board of health was exclusive and the charter provisions were not repealed or affected by the Public Service Commissions Law, and the court used this language, which is pertinent to the present consideration: " There is no question but what the authority and power to act conferred upon the board of health by the city charter were ample for the purposes intended and declared. To find them withdrawn as against a railroad corporation there should be very precise language of repeal, or such apparent

repugnance, and inconsistency in the provisions of the Public Service Commissions Law as to require those of the charter to yield to them, as a later law.   To find the charter provisions rendered less exclusive, the powers conferred in the later law should be in such language and of such unmistakable pertinence as to imply their concurrent exercise by the two bodies.   *   *   *   It would be difficult to perceive, either, a reason, or any sound policy, in conferring upon the commissions a jurisdiction concurrent with that of the city's health department.   Judicial construction of a general statute should guard against interpreting its language, so as to create conflict, or contradiction, with the provisions of an earlier and special statute, if it may stand independently and with a distinct and useful purpose to accomplish."

Repeals by implication are not favored and will not be indulged in if there is any other reasonable construction.   In my opinion there is no conflict in the statutes; both may stand and be operative without repugnance to each other, or giving rise to any conflict of authority.   If the Legislature had intended to withdraw the power from the local authorities and vest it in the Public Service Commission, it would have done so by direct enactment, as it did by abolishing the Rapid Transit Commission and expressly conferring its powers and duties upon the Public Service Commission. The Commission was given extensive powers, but they should not be extended by implication beyond what may be necessary for their just and reasonable execution.   (*People ex rel. New York, N. H. & H. R. R. Co. v. Willcox, supra.*)   " The Commission, as an extraordinary tribunal of the State, must have the power herein exercised conferred by a statute in language free from doubt.   The power is not to be taken by implication; it must be given by language which admits of no other reasonable construction."   (*Siler* v. *Louisville & Nashville R. R. Co.*, 213 U. S. 175, 194.)   If there is doubt whether the power is given, the Commission should not assume to act; but if it seems appropriate that the Commission should have the power, the Legislature should be asked to give it.

In my opinion the subject-matter of the proceeding instituted by the Commission was not within its jurisdiction, and the order should be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, DOWLING and SMITH, JJ., concur.

Order affirmed, with costs.